## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **TIMOTHY E. BRUGH** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11-cv-00027-TLW** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff, Timothy E. Brugh, pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration denying his claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 8). Any appeal will be directly to the Tenth Circuit Court of Appeals.

Plaintiff filed applications for disability insurance benefits and supplemental security income on September 25, 2006, alleging an onset date of August 19, 1999. (R. 95, 98). The Administrative Law Judge ("ALJ"), Charles Headrick, held a hearing on September 10, 2008. (R. 25). On November 4, 2008, the ALJ issued a decision finding that plaintiff had not been under a disability from August 19, 1999, through November 4, 2008, and that plaintiff is not disabled under the Social Security Act. (R. 18). On November 23, 2010, the Appeals Council denied review. (R. 1). The decision of the Appeals Council represents the Commissioner's final

decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481. On January 11, 2011, plaintiff filed the subject action with this Court. (Dkt. # 1).

The role of the Court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is only to determine whether substantial evidence supports that decision and whether the applicable legal standards were applied correctly. See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Casias v. Secretary of Health & Human Service, 933 F.2d 799, 800 (10th Cir. 1991).

A claimant for disability benefits bears the burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of his or her impairment during the relevant adjudicated period. 20 C.F.R. § 416.912(c). Disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques" administered by "acceptable medical sources" such as licensed and certified psychologists and physicians. 42 U.S.C. § 423(d)(3) and 20 C.F.R. §§ 404.1513, 416.913.

**<u>Background</u>**

Plaintiff was born on November 15, 1962, and was 37 years old on August 19, 1999, the date of his alleged onset of disability. (R. 23, 29). Plaintiff is divorced and lives with his two children, one being a minor, and one who is blind. (R. 30, 260). He has an eighth grade education. <u>Id.</u> Plaintiff previously worked as a masonry foreman and as an equipment operator, both at the medium level of exertion. (R. 42, 113, 153). Plaintiff last worked on October 19, 1994 after injuring himself while working for Mann Masonry as a foreman. (R. 31). Plaintiff stated he fell on a cement mixer with a 100-pound bag of cement in his arms. (R. 112). Plaintiff testified he attempted to return to work after the injury but no one would hire him. (R. 31).

After the injury, plaintiff stated he went through unsuccessful physical therapy and then had neck fusion surgery in April of 1995. (R. 32-33). After the surgery, plaintiff "wasn't any better" and thus had a second fusion surgery on his lower back. (R. 33). Plaintiff stated this second surgery "miserably failed" and actually made him feel worse. <u>Id.</u> Plaintiff stated he then had a third surgery in January of 2000, which he again stated did not help improve his condition. (R. 34). At the time of the hearing, plaintiff testified he was prescribed pain management medicine to help relieve pain, including Lortab, OxyContin, Soma, and 800mg Ibuprofen. <u>Id.</u> Plaintiff testified the medications cause side effects in the form of lack of stability, dizziness, impaired judgment, and some drowsiness. (R. 36). Plaintiff stated he lays down around six to eight times a day for between ten and ninety minutes at a time to take the gravity off his back. (R. 37). Plaintiff testified it is painful to bring loads of laundry into the laundry room and standing up to do dishes or shave is "excruciating." (R. 38). Plaintiff claims he can only sit for fifteen to twenty minutes before having to stand up, and once he is up, depending on how much he is moving, he "may be able go 15 minutes standing." <u>Id.</u> Plaintiff stated that although he can

drive, he often needs to get out and walk around the truck during longer trips. (R. 40). Plaintiff also testified that the most he can lift is "probably five pounds." Id. Plaintiff told the ALJ he does dishes about one third of the time, he cooks, reads, and watches television off and on throughout the day. (R. 40-41).

Many of the medical records are status updates from numerous doctors involved in evaluating plaintiff's workers' compensation claims. As plaintiff testified, he underwent three surgeries following his October 19, 1994, injury at Mann Masonry. (R. 32-34). On April 3, 1995, plaintiff underwent surgery for an anterior cervical discectomy and fusion at C5-C6 under the care of Dr. Covington. (R. 214). On February 21, 1996, plaintiff again underwent surgery at L5-Sl for a fusion "with the placement of hardware devices at the time of this surgical intervention." Id. The third surgery, on January 21, 2000, was for an anterior cervical discectomy and fusion at the C6-7 level. (R. 179).

The record contains plaintiff's medical information from Dr. Anthony Billings. (R. 163-180). On December 17, 1999, Dr. Billings reviewed plaintiff's MRI, which showed bilateral disc herniation at C6-7. (R. 163). On January 14, 2000, Dr. Billings noted plaintiff had a positive discogram at the C6-7 level and thus recommended surgery (the third surgery described above). Id. On May 2, 2000, Dr. Billings noted plaintiff still complained of neck and shoulder pain after the surgery but he stated, "I am not sure why this is happening because his x-rays show good graft placement." (R. 167). On August 18, 2000, Dr. Billings wrote a letter to the workers' compensation judge stating he "[did] not believe that [plaintiff] has achieved maximum medical improvement at this point." (R. 169). The final update in the record stated plaintiff was unchanged from previous visits, and Dr. Billings ordered an MRI of plaintiff's thoracic spine. (R. 170).

The medical record contains information on plaintiff's interactions with Dr. Eugene Feild. (R. 291-329). The final evaluation by Dr. Feild on May 11, 2001, revealed plaintiff's thoracic spine to be normal with no evidence of spinal disease, disc degeneration, desiccation, spinal stenosis, or herniation. (R. 293). The cervical spine revealed a successful surgery at C5-6. Id. There were cervical degenerative changes at C6-7 without herniation, stenosis or protrusion. Id. C6-7 also had evidence of chemical change and desiccation. Id. Dr. Feild recommended no surgery and released plaintiff for work with overhead and above chest reaching restrictions. (R. 293, 297). Dr. Feild concluded: "This gentleman is not temporarily totally disabled though he may be undergoing early degenerative changes causing referred pain into his thoracic spine from the C6-7 area." Id.

The medical record also contains notes from Dr. Richard Hastings, one of plaintiff's treating physicians for the workers' compensation court. (R. 181-222). On August 8, 2001, Dr. Hastings detailed a thorough narrative describing his medical relationship with plaintiff based on multiple evaluations. (R. 181-89). Because of his injury and three surgeries, Dr. Hastings stated plaintiff had persistent pain, significant limitation of motion and radicular features to the upper thoracic back and interscapular, as well as motor weakness of the left upper extremity with motor weakness proximally at the left shoulder girdle and motor weakness distally of the left hand grip. (R. 186). He also has persistent pain, limitation of motion and radicular features to the lower extremities with motor weakness of the right lower extremity. Id. Dr. Hastings determined plaintiff "is currently found to be 100% permanently totally disabled and economically unemployable as a direct result of the above-noted injuries until and only unless he is able to undergo a successful vocational rehabilitative training assessment program for re-entry into the workforce." (R. 189).

Dr. Ashok Kache examined plaintiff on November 19, 2002. (R. 249). The initial impression showed chronic neck and back pain syndrome, status post cervical decompression and lumbar decompression. Id. The plaintiff received a trigger point injection and Dr. Kache renewed plaintiff's prescriptions for Lortab and Flexeril. Id. On August 15, 2006, Dr. Kache's impression of plaintiff was still chronic neck and lower back pain, and bone fusion at C5-C7, and degenerative joint disease and bone spurs at L5-S1. (R. 224). Dr. Kache prescribed Lortab, Ibuprofen, and Robaxin. (R. 224-25). Dr. Kache reviewed a CT of the cervical spine done by Dr. Tim Manda on May 22, 2006, which showed postoperative changes with spinal fusion from C5-C7 and some bone irregularity at C5-C6 and C6-C7.  Id.  On February 13, 2007, Dr. Kache's examination of plaintiff showed a very stiff neck with decreased range of motion and tenderness in the bilateral upper trapezius muscles with shoulder elevation decreased by about 50%. (R. 287). Dr. Kache's impression of plaintiff was still chronic back and neck pain syndrome and post cervical fusion. Id. Medications remained the same. Id. The final record from Dr. Kache on September 11, 2007, indicates his impression of plaintiff stayed the same: chronic back and neck pain syndrome and post cervical and lumbar fusion. (R. 345). The examination showed no outward guarding or pain behaviors. Id. Dr. Kache observed plaintiff as still tender in the lumbar and cervical paraspinals with decreased range of motion in both locations as well as a minimally antalgic gait. Id. Dr. Kache prescribed a trial of 10mg OxyContin. Id.

On August 23, 2006, Dr. Jeffrey Halsell examined plaintiff and his impression was that plaintiff had chronic axial neck pain and chronic low back pain with bilateral radicular symptoms. (R. 252). Dr. Halsell recommended pain management per Dr. Kache and epidural steroid injections. Id. The records suggest Dr. Halsell completed two injections in a series of three. (R. 250-51).

On December 19, 2006, Dr. Larry Vaught conducted a social security disability exam of plaintiff. (R. 260). During the examination, Dr. Vaught observed plaintiff to be pleasant and cooperative but stiff and distracted by pain at times. (R. 261). Dr. Vaught concluded plaintiff obtained a Full Scale IQ of 87, placing him at the 19th percentile, showing relative strength in the verbal comprehension index and relative weakness in working memory and processing speed. Id. Dr. Vaught's only diagnosis was Axis III pain disorder. (R. 262).

On January 3, 2007, Dr. Burnard Pearce conducted a psychiatric review technique and determined plaintiff had no medically determinable mental impairment and gave no mental diagnosis. (R. 264, 276).

On January 3, 2007, Dr. David Bissell conducted a physical residual function capacity assessment. (R. 278-85). His primary diagnosis of plaintiff was degenerative disc disease with a secondary diagnosis of s/p cervical fusion. (R. 278). Dr. Bissell determined plaintiff had the ability to perform consistent with a full-range of light work with no other identified limitations. (R. 279-85). Dr. Bissell provided this explanatory paragraph:

> 44 year old with 9 years of education alleging back and neck problems and bad spelling. MER shows L5-S1 fusion 1996, c/s fusion 1995 and 2000, C5-C7. Current MER exams show decreased active ROM c/s and l/s, 5/5 motor strength, DTR's 2/4. CT l/s and c/s 5/06 shows s/p fusions, irregular disc spaces, postoperative changes L5-S1. ADL's show he is able to perform his own personal care with some limitations due to pain, prepares meals, does light housekeeping, drives, shops for food. It appears that he would have this RFC secondary to the l/s and c/s fusion, reported ADL's and current exam findings. Recent exams show normal strength in upper and lower extremities, normal sensation and DTR's in extremities and normal gait.

(R. 279-80). On May 7, 2007, Dr. Sally Varghese affirmed as written Dr. Bissell's January 3, 2007, physical residual functional capacity assessment, stating, "ADL's appear to be limited due to [plaintiff's] physical allegations only." (R. 289). On May 8, 2007, Dr. Judy Marks-Snelling also affirmed as written Dr. Bissell's assessment. (R. 290).

7

Dr. Steven Anagnost evaluated plaintiff multiple times beginning April 10, 2007. (R. 330-344). Dr. Anagnost reviewed an MRI showing cervical bony fusion at C5-7, no fracture or subluxation, and bony irregularities at C5-6, C6-7. (R. 343). His impression showed cervical instability, pain, radiculopathy in the upper extremities, and weakness in the upper extremities. Id. On May 1, 2007, Dr. Anagnost's impression of plaintiff was chronic neck pain, status post cervical fusion, and radiculopathy in the upper extremities. (R. 338). Dr. Anagnost determined plaintiff was not a good surgical candidate but would enroll him in physical therapy. Id. He also noted plaintiff continued to smoke despite his requests to stop. Id. On July 24, 2007, Dr. Anagnost's impression of plaintiff showed degenerative disk disease of the lumbar spine, status post lumbar fusion, lumbosacral spondylosis, chronic low back pain, and nicotine addiction. (R. 334). Dr. Anagnost placed plaintiff in a corset for support and prescribed him Chantix, again stressing the need to quit smoking. Id. The final medical update in the record from Dr. Anagnost on August 14, 2007, reviews an MRI showing fusion at L5-S1 with facet arthropathy L4-5 and L3-4. (R. 330). Dr. Anagnost's impression of plaintiff revealed status post lumbar fusion, chronic back pain, and lumbosacral spondylosis with severe facet arthropathy. Id. Dr. Anagnost recommended lower back exercise and medication. Id.

## Decision of the ALJ

The ALJ found plaintiff was not under a disability from August 19, 1999, through November 4, 2008. (R. 18). At step one of the five step sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date.[1] (R. 20).

---

[1] The Commissioner's regulations set forth a five-step process for evaluating disability under the SSA. The five steps are: (1) Is the claimant currently working? (2) Does the claimant have a medically severe impairment? (3) Does the impairment meet or equal an Appendix 1 listing for presumptive disability? (4) Does the impairment prevent the claimant from performing her past

At step two of the analysis, the ALJ determined plaintiff had the following medically severe impairments: degenerative disc disease and status post fusion at C5-6, C6-7, and L5-S1. Id. At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925 and 416.926). (R. 21). The ALJ stated he "carefully compared the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments," specifically Listing l.04, pertaining to disorders of the spine, which showed no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Id.

Prior to step four, the ALJ determined plaintiff has the residual functional capacity ("RFC") to perform light exertional work.[2] Id. The ALJ apparently adopted the functional limitations set forth by Dr. David Bissell and Dr. Judy Marks-Snelling, state agency medical experts.[3] (R. 22). The ALJ determined the RFC assessment was reasonable given the objective medical evidence. Id. At step four of the analysis, the ALJ determined that plaintiff was unable to do his past relevant work as a masonry foreman or a heavy equipment operator, which are jobs

---

relevant work? (5) Does the impairment prevent the claimant from performing any other work? See 20 C.F.R. §§ 404.1520, 416.1520, 416.920.

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[3] In his opinion, the ALJ never expressly states he is adopting the functional limitations set forth by the state agency physicians. The opinion does state, "Two medical experts with the State Agency also determined that claimant could perform light work activity." (R. 22). Thus, on review, the Court can only assume the ALJ adopted the findings of the state physicians in making his RFC determination.

that require a medium level of exertion. (R. 22). Finally, at step five, based on the testimony

from the Vocational Expert ("VE"), the ALJ concluded plaintiff was capable of performing other

work that exists in significant numbers in the national economy such as a production inspector,

food service worker, order clerk, or assembly worker. (R. 23). In addition, the ALJ used the

Medical-Vocational Guidelines as a framework in his decision-making. Id. Thus, at step five, the

ALJ determined a finding of "not disabled" was appropriate. (R. 24).

## Issues on Appeal

Plaintiff requests that this Court grant an outright award of benefits or remand the ALJ's

decision with instructions based on the following alleged errors:

1.       The ALJ failed to perform a proper step 5 determination,

2.       The ALJ failed to properly evaluate the medical source opinions, and

3.       The ALJ failed to perform a proper credibility determination.

(Dkt. # 12 at 2).

## Discussion

### The ALJ's Step Five Analysis

Plaintiff's first allegation of error by the ALJ contains numerous arguments as to why the

ALJ erred at step five of the analysis. (Dkt. # 12 at 2-4). Some of the arguments contain no

developed analysis or argument, and the Court will only address those arguments necessary to

determine the merits of the allegation of error and to provide further guidance to the ALJ.

Plaintiff argues the ALJ did not propound a hypothetical to the VE. (Dkt. # 12 at 2). This

argument lacks merit. The ALJ clearly provided a hypothetical during the VE's testimony:

> Assume the claimant, I believe at the time of this evaluation he would have been
> 44 years of age, with eighth-grade education, the ability to read, write and use
> numbers. Assume further the individual in general has the physical capacity to
> perform work consistent with the limitations of Exhibit 7F.

(R. 42). Based on the hypothetical, the ALJ asked the VE whether plaintiff could return to his

past relevant work, or if he could perform other jobs. (R. 42-43).

Next, plaintiff offers numerous reasons in support of his argument that the hypothetical

used by the ALJ was not precise. (Dkt. # 12 at 2-4). First, plaintiff claims the hypothetical failed

to include limitations for physical demands such as sitting, standing, walking, lifting, carrying,

pushing and pulling, or postural functions of stooping, crouching, reaching and handling. (Dkt. #

12 at 2). The Court disagrees. Exhibit 7F, as used in the hypothetical posed to the VE, is a

physical residual functional capacity assessment completed by a state agency physician. (R.

278). This assessment includes all of the exertional and postural limitations that plaintiff argues

were missing from the hypothetical, in addition to manipulative, visual, communicative, and

environmental limitations. (R. 278-85).

Although the Court finds no error with the ALJ's use of Exhibit 7F, the Court finds an

ambiguity in the ALJ's decision relevant to plaintiff's limitations.[4] In his decision, the ALJ found

that plaintiff had the RFC to perform the full range of light work without identifying any

limitations. (R. 21-22).  However, in step five of the sequential analysis, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range of light
> work, a finding of "not disabled" would be directed by Medical-Vocational Rule
> 202.18. However, the claimant's ability to perform all or substantially all of the
> requirements of this level of work **has been impeded by additional limitations**. To
> determine the extent to which these limitations erode the unskilled light occupational
> base, the Administrative Law Judge asked the vocational expert whether jobs exist in
> the national economy for an individual with the claimant's age, education, work
> experience, and residual functional capacity.

(R. 23) (emphasis added). This apparent conflict between the ALJ's RFC determination that

plaintiff could perform the full range of light work, and then his later determination that

---

[4] Although plaintiff does not raise this specific issue within his step five allegation of error, the
Court finds this troubling aspect of the ALJ's decision is necessary to consider in order to fully
analyze plaintiff's first allegation of error involving the ALJ's step five determination.

additional limitations impeded plaintiff's ability to perform the full range of light work needs to be resolved. To be more specific, the fact that the ALJ used a hypothetical instead of using the Medical-Vocational Guidelines to make a disability determination may suggest that he determined that plaintiff had limitations that prohibited use of the guidelines. "[T]he grids will be inappropriate where the predicate for using the grids-the ability to perform a full range of either medium, light or sedentary activities-is not present." Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988). Thus, the ALJ may have found additional limitations or impairments, but failed to mention what they were, or the ALJ may have intended some other meaning. In any event, it is well settled that hypothetical questions should precisely reflect all of the claimant's impairments to constitute substantial evidence. Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation omitted) ("[t]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.").

In addition, plaintiff argues that the ALJ failed to include or exclude plaintiff's hand and arm limitations in his hypothetical and RFC, specifically carpal tunnel syndrome of the left hand, decreased grip strength of the hands, and weakness and decreased range of motion in the shoulders. (Dkt. # 12 at 3). The ALJ's hypothetical "must include all (and only) those impairments borne out by the evidentiary record." Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995). The record contains only one page suggesting "mild CTS" on the left side. (R. 336). In addition, plaintiff points to only three pages in the entire record that mention plaintiff's "mildly" and "slightly" decreased grip strength of the hands. (Dkt. # 12 at 3, (citing R. 224, 230, 232)). There is no other evidence or discussion by plaintiff or medical professionals suggesting these

impairments or how they would limit the plaintiff's ability to work. Thus, the Court finds these

specific limitations are not "borne out by the evidentiary record." Evans, 55 F.3d at 532.

However, plaintiff points to numerous places in the record that suggest a decreased range

of motion in the shoulder muscles. (Dkt. # 12 at 3). The Court reviewed the relevant medical

evidence cited by plaintiff:

> R. 184: He has moderate chronic myofasciatis over the posterior cervical paraspinus musculature extending from the occipital region to the trapezius muscles and along the interscapular distribution to the mid shoulder blade level.

> R. 185: Examination of the left shoulder reveals motor weakness of the left shoulder girdle; Examination of the right shoulder reveals normal strength testing.

> R. 224: He is diffusely tender in the cervical parnspinals, both upper trapezius muscles, interscapular thoracic muscles and also in the lumbar paraspinals. Shoulder elevation is close to 140 degrees, which is quite good for him.

> R. 228: Exam today shows decreased shoulder elevation bilaterally, worse on the right side.

> R. 229: Exam today shows shoulder elevation to about 120 degrees with some effort in flexion and a bit less in abduction. He is diffusely tender in the upper trapezius muscles bilaterally.

> R. 230: Examination today shows tight cervical paraspina1s and bilateral upper trapezius muscles, reduced cervical range of motion in all directions due to his previous cervical fusion.

> R. 233: Examination shows point of maximum tenderness in the left upper trapezius muscle close to the midline near the spinus process and in the mid upper trapezius as well. Shoulder elevation bilaterally in forward flexion is 120 degrees but abduction is limited to 90 degrees. Neurologically he is intact in both upper extremities.

> R. 246: On examination, he continues to have an area of persistent tenderness in the left-sided upper medial trapezius muscle near its insertion to the C-spine and the upper thoracic spine. Shoulder range of motion is at 130 degrees of flexion and abduction. Status post cervical fusion with residual myofascial pain syndrome, primarily affecting the left side of the neck and shoulder.

> R. 249: Palpation of the upper trapezius muscles, particularly on the left side, shows mild and diffuse tenderness with a trigger point in the medial insertion to

the spine at about C8-T1 level. The right upper trapezius muscle is minimally tender.

R. 287: Decreased range of motion and tenderness in the bilateral upper trapezius muscles. Shoulder elevation is decreased by about 50%.

R. 343-346: Weakness and radiculopathy in upper extremities. Moderately and diffusely tender in the upper trapezius muscles.

The Court finds that there is not substantial evidence in the record, as demonstrated above, for the ALJ to fail to mention why he excluded the plaintiff's weakness and decreased shoulder range of motion and their relationship with plaintiff's ability to perform work. The ALJ should provide such explanation. Evans, 55 F.3d at 532.

In summary, due to the above stated internal inconsistencies in the ALJ's opinion and the ALJ's lack of clarity and reasoning in his step five determination regarding the plaintiff's limitations, this Court cannot say with confidence that all of the plaintiff's limitations were included in the hypothetical. At step five, "the burden shifts to the [agency] to show that the claimant retains the residual functional capacity (RFC) to do other work that exists in the national economy." Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citing Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991) and 42 U.S.C. § 423(d)(2)(A)).

The Court concludes a remand is required in order for the ALJ to clarify his step five finding as set forth above. The Court finds the remaining allegations of error at step five to be without merit.

**The ALJ Failed to Properly Evaluate the Medical Source Opinions**

Plaintiff sets forth numerous arguments alleging the ALJ failed in evaluating the medical source opinions. (Dkt. # 12 at 4-6). It is settled that the ALJ is required to evaluate "every medical opinion" received. 20 C.F.R. §§ 404.1527(d), 416.927(d); see also Baker v. Bowen, 886 F.2d 289, 291 (10th Cir. 1989) (requiring the ALJ to "consider all relevant medical evidence of

record in reaching a conclusion as to disability."). Plaintiff first argues that the ALJ failed to explain how he attributed only "some weight" to the opinion of Dr. Hastings who concluded plaintiff was "temporarily totally disabled" and later "permanently totally disabled." (Dkt. # 12 at 4, (citing R. 22)).  This argument fails. The ALJ clearly explained how he arrived at the weight:

> Such statements, made in the context of a state workers' compensation claim, are not dispositive of a claim made under Social Security. In a workers' compensation evaluation, the issue is a claimant's capacity to perform work existing with a particular employer. By contrast, under Social Security, the issue is the claimant's residual functional capacity to perform work that exists in the much broader, national economy. While a workers' compensation finding of temporary total disability may have some value in assessing the residual functional capacity of a Social Security claimant, it cannot be given controlling weight. Accordingly, the undersigned gives only some weight to the claimant being on temporary disability pursuant to state law.

(R. 22).

The Court agrees that the ALJ's reasoning is correct. "Although findings by other agencies are not binding on the Secretary, they are entitled to weight and must be considered." Baca v. Dep't of Health & Human Services, 5 F.3d 476, 480 (10th Cir. 1993) (internal quotations and citations omitted). The ALJ clearly considered the records from this doctor and assigned weight accordingly. (R. 22). Furthermore, the doctor's conclusion on plaintiff's disability is an opinion on an issue reserved solely for the Commissioner. See 20 C.F.R. §§ 404.1527(e), 416.927(e). The Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. Proper medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

Plaintiff also argues the ALJ failed to address conflicts between doctors' opinions regarding plaintiff's state of healing. (Dkt. # 12 at 4). He also argues the ALJ did not weigh the opinions of the state agency reviewers who determined plaintiff could perform light work. Id. at 5. Without addressing any further arguments, the Court agrees the ALJ's evaluation of the medical source opinions and evidence in general is lacking. The ALJ's opinion includes almost no discussion or summary of any medical opinions or evidence. Without any discussion of medical evidence it is impossible to determine what evidence the ALJ rejected or accepted, which physicians he considered "treating physicians," and what weight was given to each opinion. This Court cannot reweigh the evidence, nor substitute its judgment for that of the Commissioner. Casias v. Secretary of Health & Human Service, 933 F.2d 799, 800 (10th Cir. 1991). The only mention of any medical findings are contained in the ALJ's step two and three findings, and a short statement describing EMG and nerve conduction studies, surrounded by nothing to put the statement in context. (R. 20-21, 22). The medical record contains almost 180 pages from various doctors including Dr. Billings, Dr. Hastings, Dr. Kache, Dr. Halsell, Dr. Vaught, Dr. Pearce, Dr. Bissell, Dr. Varghese, Dr. Marks-Snelling, Dr. Feild, and Dr. Anagnost. Some of these doctors are state agency physicians and some were physicians involved in plaintiff's workers compensation claims.

The ALJ only weighed the opinion of Dr. Hastings, none of the other doctors. (R. 22). "Under 20 C.F.R. § 416.927(f)(2)(i) and (ii), an ALJ 'must consider findings of State agency medical ... consultants ... as opinion evidence, except for the ultimate determination about whether you are disabled,' and, "[u]nless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical ... consultant...." Shubargo v. Barnhart, 161 F. App'x 748,

754 (10th Cir. 2005). "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." Hamlin v. Barnhart, 365 F.3d 1208, 1223 (10th Cir. 2004) (citing 20 C.F.R. § 416.927(f)(2)(ii)).

The Court is not suggesting the ALJ is required to recite the entire medical record in his opinion, however, some discussion as to how he evaluated the medical evidence and opinions is warranted. See Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."). The Court is also not concluding that the ALJ reached the wrong conclusion. But, as stated above, the ALJ's decision contained an insufficient discussion of medical findings for the Court to conduct a meaningful review. Thus, the Court finds a remand on this issue is necessary to allow the ALJ to discuss the medical evidence and opinions he relied upon and/or rejected in making his decision, and to allow him to explain what weight he has given to those medical opinions, including any factors he considered.[5]

Plaintiff also argues the state agency physicians' conclusions that recent examinations show normal strength in the upper and lower extremities is "abnormal," and thus the physicians failed in not reporting it. (Dkt. # 12 at 5). The Court finds no merit in this argument. An August 2006 examination by Dr. Hasell showed bilateral upper and lower extremities to be at +5/5 strength. (R. 252). Thus, the findings were not "abnormal." Plaintiff briefly argues the state agency physicians did not address MRI evidence in the record that is compatible with listing-level severity. (Dkt. # 12 at 5). The plaintiff does not state which listing he refers to or develop this argument any further, and thus it lacks merit. Id. Plaintiff also argues two pages in the record show positive straight-leg raising testing, which he argues is indicative of nerve compression and

---

[5] See 20 C.F.R. §§ 404.1527, 416.927 (listing factors to consider when evaluating opinion evidence).

constitutes listing-level severity. Id. However, one of the two pages on which plaintiff relies shows "[s]traigh[t] leg raising is negative in a seated position and mildly positive at 80 degrees on both sides supine." (R. 249). Even if this Court read both of those pages as fully supporting plaintiff's assertion, he has simply not developed any argument to suggest he has met a particular listing, let alone nerve compression. The plaintiff's remaining arguments are rejected as lacking merit.

**The ALJ's Credibility Determination**

Again, within this allegation of error, plaintiff sets forth an abundance of arguments as to why the ALJ's credibility determination was faulty, including failing to discuss any Luna v. Bowen, 834 F.2d 161, 165-66 (10th Cir. 1987) credibility factors, failing to specifically discuss which of plaintiffs complaints he did not find credible, relying on "meaningless boilerplate," ignoring agency clerk's comments and doctors comments regarding probative physical findings, discussing plaintiff's sporadic daily activities, and failing to link credibility to substantial evidence. (Dkt. # 12 at 6-9). Although some of these arguments are meritless, the Court finds the ALJ erred, in one respect, when he made his credibility determination.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (citation, brackets, and internal quotation marks omitted). "The ALJ enjoys an institutional advantage in making the type of determination at issue here. Not only does an ALJ see far more social security cases than do appellate judges, he or she is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion. As a result,

the ALJ's credibility findings warrant particular deference." White v. Barnhart, 287 F.3d 903,

910 (10th Cir. 2001). Thus, this Court reviews the ALJ's credibility determination with caution.

The ALJ set forth the plaintiff's hearing testimony as follows:

> The claimant testified at the hearing that he had tried to find work but no one would
> hire him. He stated that he had two back surgeries that failed and he was worse after
> surgery. The claimant testified that he had another surgery in 2000 and that failed
> also. He stated that he takes medication and his medication causes lack of stability,
> dizziness, and impaired judgment. The claimant testified that he lies down 6-8 times a
> day for 10-90 minutes. He stated that he did household chores but it takes a long time
> and he has to lie down between chores. The claimant testified that he can sit for 15-20
> minutes, can stand for 5 minutes, can walk about half a block, and can lift about 5
> pounds. He stated that his son helps with chores and grocery shopping.

(R. 21).

The ALJ then set forth his credibility determination finding "the claimant's medically

determinable impairments could reasonably be expected to cause the alleged symptoms;

however, the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the above residual

functional capacity assessment." (R. 21-22). The plaintiff argues this statement is "meaningless

boilerplate." (Dkt. # 12 at 6). If the ALJ's opinion included no further discussion, the Court

would agree and remand on this point alone. See Hardman v. Barnhart, 362 F.3d 676, 678–81

(10th Cir. 2004) ("[B]oilerplate language fails to inform us in a meaningful, reviewable way of

the specific evidence the ALJ considered in determining that claimant's complaints were not

credible."). However, the ALJ's decision contains a recitation of specific facts on which he relied

to make his credibility determination. He did not simply rely on standard boilerplate. Briggs v.

Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001).

The ALJ's first reason for finding plaintiff less than credible is a citation to the medical

record: "EMG and nerve conduction studies on July 12, 2007, showed no evidence of acute or

chronic radiculopathy." (R. 22). Second, the ALJ relied on the following facts: "On April 7,

19

2003, Dr. Kache stated that the claimant was doing more activity outside. On November 24, 2003, the claimant was traveling to Houston for the Thanksgiving holiday. On November 15, 2005, the claimant had lifted a five-gallon can of paint. The claimant is raising two sons by himself, one of whom is blind. This evidence indicates that the claimant is more active than alleged." (R. 22) (internal citations omitted). Assuming the accuracy and context of these facts, their recitation by the ALJ is sufficient to uphold his credibility determination.  However, one of these facts is misleading.

Plaintiff did indeed state that he lifted a five-gallon can of paint (a five gallon can of paint weighs approximately fifty pounds), but plaintiff also said that when he did so he "turned the wrong way and it locked up his lower back." (R. 228). Therefore, this fact does not establish that plaintiff can, or cannot, lift substantial weight (contrary to plaintiff's testimony that he can lift only five pounds), and it is unclear what consideration the ALJ gave this fact (e.g., did the ALJ simply forget that plaintiff was injured when he picked up the can of paint, or did the ALJ place significance on the fact that plaintiff even attempted to lift such a heavy object?). If the ALJ determines on remand that plaintiff lacked credibility irrespective of plaintiff's testimony regarding the paint can, then the ALJ's credibility determination should remain intact. Otherwise, the ALJ should revisit his credibility determination and state why this fact leads him to discredit plaintiff's testimony.

Plaintiff also argues the ALJ did not provide even a "minimal discussion" of the Luna credibility factors. (Dkt. # 12 at 6). The relevant Luna factors consist of "persistent attempts to find relief for his pain and his willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, and the possibility that psychological disorders combine with physical problems ... claimant's daily activities, and the dosage, effectiveness, and side

effects of medication." <u>Luna v. Bowen</u>, 834 F.2d 161, 165-166 (10th Cir. 1987); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. As long as the ALJ makes clear in his opinion the evidence he relied upon in making his credibility determination, he is not required to make a "formalistic factor-by-factor recitation of the evidence." <u>Qualls v. Apfel</u>, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ did so.

The Court finds the remaining allegations of error regarding the ALJ's credibility determination to be without merit.

<u>**CONCLUSION**</u>

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED and REMANDED.  On remand, the ALJ should do the following:

1. Discuss the medical evidence and opinions he relied upon and/or rejected in making his decision and explain what weight he gave to those medical opinions,

2. Resolve the ambiguity in the ALJ's decision relevant to plaintiff's limitations; specifically, the ALJ's finding that plaintiff had the RFC to perform the full range of light work without identifying any limitations and the ALJ's statement that "the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations," and

3. Address the weight given by the ALJ to plaintiff's testimony that he lifted a five gallon paint can (as discussed above).

SO ORDERED this 29th day of March, 2012.

_____
T. Lane Wilson
United States Magistrate Judge